```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF ALABAMA
                       NORTHERN DIVISION
```

**BATCH SAHO,**                            :

    **Petitioner,**                       :

**vs.**                                    :    **CIVIL ACTION 06-00525-WS-B**

**DAVID O. STREIFF**[1]**,** *et al.,*     :

    **Respondents.**                      :

## REPORT AND RECOMMENDATION

This is an action brought pursuant to 28 U.S.C § 2241 by Batch Saho,[2] a citizen and native of The Gambia, who is being detained by the U.S. Department of Homeland Security, Immigration and Customs Enforcement ("ICE"). (Doc. 1). This action has been referred to the undersigned for report and recommendation pursuant to 28 U.S.C § 636(b)(1)(B) and Local Rule 72.1(c) and is now ready for consideration. The record is adequate to determine Saho's claims; thus, no evidentiary hearing is required. Following a careful review of the record, it is recommended that the instant petition be dismissed, without prejudice.

## FINDINGS OF FACT

---

[1] Bill Bateman is no longer the Warden of the Perry County Correctional Center. Accordingly, pursuant to the provisions of Rule 25(d) of the Federal Rules of Civil Procedure, David O. Streiff, as Warden of that facility, is substituted for Bateman as a proper Respondent in this action.

[2] Petitioner also employs the alias "Kabe Gaye." (Doc. 14, Ex. A-1).

1.     Saho is a native and citizen of The Gambia, who entered the United States illegally on December 14, 1994 via JFK International Airport in New York, New York. (Docs. 1; 13, Ex. A-11).

2.     On December 15, 1994, Petitioner was served with an ICE form I-122, directing him to appear before the Executive Office Immigration Review Judge in order to explain his presence in the United States.  Saho did not appear before the Immigration Judge, and on April 15, 1996, he was ordered removed from the United States in absentia. Saho did not appeal his final order of removal. (Doc. 14, Ex. A-1).

3.     On October 24, 1998, Saho represented to the Deportation Office ("DO") that he had left the United States after April 15, 1996, and returned as a stowaway into Baltimore, Maryland. (Id.)

4.     On April 28, 1999, Saho filed an application for asylum under the name "Kabe Gaye." (Id.)

5.     On May 27, 1999, "Kabe Gaye" was served with a "recommend removal" letter from asylum authorities contingent upon fingerprint clearance by law enforcement.  On April 21, 2001, "Kabe Gaye" was directed to appear at the asylum office with his police record clearance; however, "Gaye" never appeared. The "Kabe Gaye" file was then referred to the New York ICE office, and subsequently, a fingerprint comparison was made from imprints by "Gaye" and Saho, which indicated that they were one and the same person. (Id.)

6. On April 9, 2003, Saho was taken into ICE custody for remaining in the United States in violation of the order of removal.  (Id.)

7. Thereafter, between May 29, 2003 and April 5, 2006, a series of communications between Saho, ICE, and the Gambian consulate occurred wherein Saho refused to cooperate with ICE in obtaining the necessary documents to effect his deportation to The Gambia.

    a. On December 3, 2003 and January 6, 2004, Saho advised the consulate that he wished to remain in the United States and asked that the consulate not issue travel documents.

    b. Between April 11, 2004 and October 6, 2004, ICE made eight (8) requests of Saho to provide a letter to the Consulate of The Gambia requesting travel documents; Saho would not comply with these requests. (Doc. 14, Ex. A-2).

    c. On December 9, 2004, the DO learned from the consulate that, contrary to what Saho had indicated to ICE, Petitioner had been calling the Gambian Embassy stating that he did not wish to return to The Gambia.  As a result, the consulate suggested that The Gambia would not issue travel documents unless Petitioner personally wrote a letter requesting travel documents.  (Id.)

    d. On December 17, 2004, Saho refused to speak English in the presence of a DO officer while being interviewed by the consulate. (Id.)

    e. Between March 25, 2005 and March 10, 2006, ICE DO

        officers made bi-weekly requests of Saho to provide a written request to the Gambian Consulate for the issuance of travel documents, to no avail. (<u>Id.</u>)

   f.   On April 5, 2006, when asked by DO officers to write a letter requesting travel documents, Saho refused and stated that he would not write the letter because the consulate would issue him a passport and he would have to go home.  (<u>Id.</u>)

   g.   The record indicates that on at least 5 occasions (May 30, 2003; March 18, 2004; March 1, 2006; September 21, 2006; November 21, 2006), Saho was provided with an ICE Form I-229(a) Warning for Failure to Depart, along with an Instruction Sheet to Detainee Regarding Requirement to Assist in Removal, detailing Petitioner's obligation to assist in effecting his removal from the United States. (Doc. 14, Ex. A-1, A-2, A-4 to 7).

8.   On September 5, 2006, Saho filed the instant petition for writ of habeas corpus, seeking his immediate release from ICE custody on the ground that his continued detention by ICE amounts to an indefinite period of detention in violation of federal law as interpreted by the United States Supreme Court in <u>Zadvydas v. Davis</u>, 533 U.S. 678, 121 S.Ct. 2491 (2001). (Doc. 1).  According to Saho, he has cooperated fully with ICE; however, the Government has been unable to remove him to The Gambia. (Doc. 1, p. 5). Petitioner

4

asserts that there is no significant likelihood he will be removed to The Gambia in the reasonably foreseeable future and seeks to be released under an order of supervision. (Id.)

9.    Respondents assert that Saho remains detained because of his own actions. (Doc. 14).  More specifically, Respondents allege that Saho's repeated obstructionist acts, including giving ICE false information concerning his discussions with the consulate, using a false identity, and his refusals to personally write a letter to the consulate requesting travel documents, have thereby effectively prevented his removal to The Gambia.  Respondents further assert that the removal period is tolled if the alien fails or refuses to cooperate with removal and that in light of Saho's attempts to thwart the deportation process, his confinement is proper, and this action should be dismissed.

## CONCLUSIONS OF LAW

As a preliminary matter, the undersigned finds that this Court has jurisdiction over Petitioner's case notwithstanding the fact that he has been transferred out of this District[3].  The record reflects that at the time Petitioner filed his petition, he was being detained at the Perry County Correctional Center, which is located in this District. (Doc. 1).  The proper defendant in a habeas case is generally the petitioner's "immediate custodian,"

---

[3] Saho filed a Notice of Change of address which reflects that he was transferred to Elizabeth, New Jersey in November 2006. (Doc. 11).

that is, the warden of the facility in which the petitioner is incarcerated or detained at the time he files the habeas petition. Rumsfeld v. Padilla, 542 U.S. 426, 439, 124 S. Ct. 2711, 159 L. Ed. 2d 513 (2004). Based upon a reading of the Supreme Court's Padilla decision, it does not appear that Padilla alters the well-settled rule that if a district court properly acquires jurisdiction when the case is filed, then the petitioner's subsequent removal to another judicial district does not destroy the court's jurisdiction. 542 U.S. at 440, 124 S. Ct. at 2721, 159 L. Ed. 2d at 531, *relying on* Ex parte Endo, 323 U.S. 283, 306, 65 S. Ct. 208, 89 L. Ed. 243 (1944). Thus, jurisdiction attaches upon the initial filing of the § 2241 petition and will not be destroyed by a petitioner's subsequent Government-effectuated transfer and accompanying change in physical custodian. Tang v. Gonzales, 2006 U.S. Dist. LEXIS 93572 (N.D. Fla. 2006)(citing Mujahid v. Daniels, 413 F.3d 991, 994 (9th Cir. 2005)).

In Tang, the court observed that the petitioner had been previously detained in three other facilities before being transferred to that district and that the petitioner's case was a good example of the difficulty that would be caused if jurisdiction shifted whenever a petitioner was transferred. According to the court in Tang, "[i]f a § 2241 petition must be transferred every time the petitioner is transferred, it is doubtful that the case would ever be decided." Id. at *6. In this case, the evidence is

undisputed that Petitioner was incarcerated within this District at the time he filed his § 2241 petition. (Doc. 1).  Accordingly, the undersigned finds that this Court has jurisdiction over Petitioner's case notwithstanding the fact that he was transferred out of this District following the filing of his petition.

As noted supra, Saho is challenging his continued detention pending removal.  Specifically, Saho asserts that his detention, since 2003, constitutes an "indefinite detention" not authorized by 8 U.S.C. § 1231(a).  Section 1231(a) provides that ordinarily "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A).  In interpreting § 1231[4], the Supreme Court, in

---

[4] 8 U.S.C. § 1231, entitled "Detention and Removal of Aliens to be removed," states in pertinent part:

> (a) Detention, release, and removal of aliens ordered removed
>
> > (1) Removal period
> >
> > (A) In general
> >
> > > Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").
> >
> > (B) Beginning of period
> >
> > > The removal period begins on the latest of the following:
> > >
> > > (I) the date the order of removal becomes

Zadvydas v. Davis, held that the statute "limits an alien's post-removal period detention to a period reasonably necessary to bring about that alien's removal from the United States.  It does not permit indefinite detention." 533 U.S. 678, 689 (2001).[5]  The

---

>>administratively final.

>(ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final Order.

>(iii) If the alien is detained or confined (except under an Immigration process), the date the  alien is released from detention or confinement.

>(C) Suspension of period

>>The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith
for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

8 U.S.C. § 1231.

[5]While  Zadvydas considered the detention of legal permanent aliens beyond the 90-day removal period, the Court, in Clark v. Martinez, 543 U.S. 371, 386 (2005), extended its interpretation of 1231(a)(6) to inadmissible aliens under 8 U.S.C. § 1182. See also Benitez v. Wallis, 402 F.3d 1133 (11th Cir. 2005) (relying on Clark to hold that an inadmissible alien can no longer be detained beyond the 90-day removal period where there was no significant likelihood of removal in the reasonably foreseeable future). But see Powell v. Ashcroft, 194 F. Supp. 2d 209 (E.D.N.Y. 2002) (finding Zadvydas inapplicable because it did not address the constitutionality of § 1231(a)(1)(C) and the tolling of the  period of removal due to an alien's non-cooperation and noting that Zadvydas was concerned with aliens who were in "deportation limbo" because their countries of origin refused to allow them entry).

Zadvydas Court further stated, however, that "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." Id. at 701.  The Court addressed constitutional concerns by concluding that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." Id. at 699. The Court went on to hold that "the presumptive period during which the detention of an alien is reasonably necessary to effectuate his removal is six months" pursuant to § 1231. Clark v. Martinez, 543 U.S. 371, 378 (2005). However, an exception to this requirement, as previously set out, exists in § 1231(a)(1)(C), and allows for a petitioner's detention period to be extended "if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal."

In other words, the period of time during which an alien is uncooperative or acts to hinder his removal tolls the six-month presumptive period of removal pursuant to Zadvydas. See, e.g., Wang v. Carbone, 2005 U.S. Dist. LEXIS 24499 (D.N.J. Oct. 17, 2005) (calculating presumptive period excluding period of non-cooperation).  Therefore, in considering whether there appears to be no significant likelihood of removal in the reasonably foreseeable future, this Court must consider whether Saho's removal

9

has been delayed or extended by his own efforts.

In his petition, Saho avers that he has cooperated with efforts by ICE to repatriate him.[6]  While it is true that Saho has been interviewed by the Gambian consulate on multiple occasions and has provided the Court with an address of where he would live if released[7], the evidence, when taken in its entirety, shows that Saho has obstructed the removal process and that his actions have led to his continued detention. Specifically, Saho does not dispute that he advised the consulate that he wished to remain in the United States and asked that the consulate not issue travel documents. While Petitioner's truthful statement that he did not wish to return to his country of origin alone may not be sufficient grounds for extending post-removal detention, Seretse-Khama v. Ashcroft, 215 F. Supp.2d 37, 50-53 (D.D.C. 2002)[8], he also took the affirmative step

---

[6]Scant evidence has been demonstrated of such efforts. The Petitioner only provides two specific examples in his petition of assisting ICE in obtaining travel documents wherein he states that he "applied three times for travel documents with his embassy, petitioner has provided necessary biographical information and all identity documents" and "[o]n or about December 9, 2005, Petitioner was taken to Washington, DC, in his embassy in order to apply for travel documents." (Doc. 1, pp. 3, 5). However, Petitioner does not provide evidence in support of his contentions.

[7]Petitioner indicates that, if released, he will reside at 1563 Metropolitan Avenue, Apt MA, Bronx, New York 10462. (Doc. 1).

[8]In Seretse-Khama, the Court rejected respondent's argument that because Petitioner told his consulate that he did not wish to return to his country of origin, he was hindering his removal. The court noted that Petitioner had not "refused to request

of calling the consulate, without ICE's knowledge, in order to ask the consulate not to issue travel documents.  Further, Saho does not dispute that he has repeatedly refused to write a personal letter to the consulate requesting said travel documents. In other words, Saho's communications go beyond simply stating that he does not wish to return to The Gambia.  He has attempted to thwart the deportation process. Jian Bin Tang v. Gonzales, 2006 Dist. LEXIS 93576, at *25 (N.D. Fla. Oct. 13, 2006); see also Baghdasaryan v.Chertoff, 2007 WL 2127724, *1 (N.D. Ga. July 25, 2007) ("When an alien acts to prevent his or her removal, the government may continue to detain the alien."); Rodriguez v. Gonzales, 2007 WL 1655604 (N.D. Fla. June 4, 2007) (denying alien's habeas petition where alien failed to establish that he had made any effort to assist in his removal or that he had done all that he was capable of doing to assist ICE); Lema v. INS, 341 F.3d 853, 856-7 (9th Cir. 2003) (holding that "when an alien refuses to cooperate fully and honestly with officials to secure travel documents from a foreign government, the alien cannot

---

travel documents or refused to be interviewd by Liberian officials." During an interview with the consulate, the petitioner truthfully answered questions and "honestly told the Consul that he did not want to return to Liberia in light of his lack of family in or ties to Liberia, which he left ... when he was only eight years old." The court concluded that such a statement, without more, does not amount to "bad faith failure to cooperate." 215 F. Supp. 2d 37, 51 (D.D.C. 2002). In contrast to Seretse-Khama, Saho, who was 34 years old when he entered the United States, has not alleged a lack of family or ties to The Gambia, and he has, in fact, refused to write a letter requesting travel documents from the consulate. (See Doc. 14, Ex. A-11).

11

meet his or her burden to show there is no significant likelihood of removal in the reasonably foreseeable future."); Pelich v. I.N.S., 329 F.3d 1057, 1060 (9th Cir. 2003) ("Zadvydas does not save an alien who fails to provide requested documentation to effectuate his removal. The reason is self-evident: the detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock."). In Pelich v. I.N.S., the Ninth Circuit Court of Appeals addressed this issue in a similar case and held the following:

> The risk of indefinite detention that motivated the Supreme Court's statutory interpretation in Zadvydas does not exist when an alien is the cause of his own detention. Unlike the aliens in Zadvydas, Pelich has the "keys [to his freedom] in his pocket" and could likely effectuate his removal by providing the information requested by the INS.

329 F. 3d at 1060.(citing Parra v. Perryman, 172 F.3d 954, 958 (7th Cir. 1999).

The Gambian consulate has not issued travel documents for Saho, and it appears that The Gambia's most recent decision not to grant Saho travel documents was based almost entirely on Saho's representations that he did not wish to return to The Gambia and his refusal to write a letter requesting travel documents. In fact, the record reflects that The Gambian Embassy indicated it would not

issue travel documents without a request from Saho; thus, a personal letter from Saho requesting travel documents is all that is needed to begin the process of issuing travel documents. (Doc. 14, Exs. A-3, A-8, A-11)[9].  Because of Saho's refusal to write a letter requesting the travel documents, ICE's request for travel documents for Saho have essentially been ignored by the Gambian consulate. (Doc. 14, Ex. A-10).   Clearly, Saho holds the "keys [to his freedom] in his pocket" and could likely secure removal by providing the letter requested by the Gambian consulate.  Simply put, Saho has caused the extended detention about which he now complains due to his failure to cooperate.  In light of such, Saho cannot demonstrate that "there is no significant likelihood of removal in the reasonably foreseeable future." Zadvydas, 533 U.S. at 701. Saho's non-cooperation with ICE has tolled the six-month removal period. Accordingly, the undersigned finds that Saho has failed to establish that his continued detention is improper under 8 U.S.C. § 1231(a)(1)(C).

## CONCLUSION

For these reasons, the undersigned recommends that this Court dismiss, without prejudice, Saho's petition under 28 U.S.C. § 2241.

The attached sheet contains important information regarding

---

[9]Respondents suggest that the Gambian consulate "wishes to see Saho's earnest request in writing, if for no other reason, to protect themselves from claims of assisting in the wrongful removal of Saho from this country against his wishes." (Doc. 14).

13

objections to the report and recommendation of the undersigned magistrate judge.

Done this the **9th** day of **June, 2008.**

                                          **/s/ SONJA F. BIVINS**
                                  **UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.   **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)©; Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Opposing party's response to the objection.**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **Transcript (applicable where proceedings tape recorded)**.  Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.